**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| RACHELLE RIDOLA,<br><br>    Plaintiff,<br><br>    v.<br><br>INGRID CHAO, et al.,<br><br>    Defendants. | Case No.  16-cv-02246-BLF<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**<br><br>[Re:  ECF 58] |

Plaintiff Rachelle Ridola ("Ridola") brings this Motion for Default Judgment by the Court against Defendants Ingrid Chao, an individual, and Nelson Chao, an individual, collectively d/b/a Executive Inn-Morgan Hill (collectively "Defendants").  *See generally* Mem. P. & A. ISO Mot. Default J. ("Mem."), ECF 58-1.  On November 20, 2017, the court clerk entered default against Defendants.  ECF 56.  Although Defendants have appeared in this action, as discussed below, they have not filed a responsive pleading to Ridola's First Amended Complaint ("FAC") and they have not moved to set aside the clerk's entry of default, despite having done so with respect to a prior entry of default against them in this case.

The Court held a hearing on the present motion for default judgment on May 10, 2018. Defendants did not appear, despite being served with Ridola's moving papers and filing an opposition indicating their awareness of the hearing date and time.  *See* ECF 60, 62.  For the reasons outlined below, the Court GRANTS Ridola's motion for default judgment, and awards statutory damages, attorneys' fees, and litigation costs.

## I. BACKGROUND

The procedural history of this case differs from a typical motion for default judgment filed after a defendant fails to respond to a lawsuit. As the following factual and procedural history makes clear, despite Defendants' initial participation in this case, they have since failed to comply with the Federal Rules and defend this action. The Court briefly summarizes the facts and then provides the procedural history in detail because Defendants' sporadic attempts to litigate this case are relevant to the Court's determination of Ridola's motion for default judgment.

Ridola is a California resident who has been partially paralyzed since 2013 as a result of a brain aneurism and a stroke. *See* First Amended Complaint ("FAC") ¶ 5, ECF 40; Declaration of Rachelle Ridola ISO Motion for Default Judgment ("Ridola Decl.") ¶¶ 1-2, ECF 58-2. Ridola uses a wheelchair for mobility. *Id.* Defendants own and operate the public accommodation known as the Executive Inn-Morgan Hill, located at 16505 Condit Rd., Morgan Hill, CA 95037 ("the Motel") and the real property on which the Motel is located. FAC ¶ 6. Ridola stayed at the Motel on four separate occasions including on April 28, 2014 and April 29, 2014. *Id.* ¶ 14; Ridola Decl. ¶ 4. Each time she stayed at the Motel, Ridola requested an accessible room—but her request was denied each time without explanation. Ridola Decl. ¶ 5. Ridola further had difficulties exiting her car because a ramp encroaches into the access aisle. *Id.* ¶ 6. Ridola also could not find any compliant accessible seating in the breakfast area for use by persons with disabilities. *Id.* ¶ 7; FAC ¶ 15.

On April 25, 2016, Ridola filed a complaint pursuant to Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, the California Unruh Civil Rights Act (the "Unruh Act"), the Disabled Persons Act, and the California Health & Safety Code. *See generally* Compl., ECF 1.[1] Ridola alleged that Defendants failed to make the Motel and its parking lot accessible to all customers regardless of disability. *See* Compl., ¶¶ 1-2. The Court issued a summons for Defendants on April 26, 2016. ECF 5. On May 1, 2016, a registered process server personally served Nelson Chao by providing him with a copy of the summons and

---

[1] Ridola initially named Gold State Investments, Inc. ("Gold State") as a defendant, but Ridola voluntarily dismissed her claims against Gold State without prejudice on March 27, 2017. ECF 29.

the complaint. ECF 7. Ingrid Chao was served via substitute service on May 1, 2016, when the registered process server provided Nelson Chao, a competent member of the household, with the summons and complaint. *Id*. Nelson Chao and Ingrid Chao each answered the original complaint on May 19, 2016 and June 22, 2016, respectively. *See* ECF 9, 11.

On August 5, 2016, a joint site inspection of the Motel occurred pursuant to General Order 56. *See* Mem. at 2. Although Defendant Nelson Chao attended the inspection, Defendant Ingrid Chao did not attend. *See* Declaration of Irakli Karbelashvili ("Irakli Karbelashvili Decl.") ¶ 4, ECF 58-11. On December 20, 2016, Defendant Nelson Chao and Ridola participated in a Court sponsored mediation with Howard Herman, Esq. *See* Mem. at 2. The parties did not reach a settlement. ECF 22. Having concluded the General Order 56 process, Ridola requested a Case Management Conference, which the Court held on March 23, 2017. *See* ECF 21, 23, 26. Ridola and Nelson Chao appeared at the Case Management Conference, but Ingrid Chao did not appear. ECF 26. The Court set a case schedule for this action and referred the parties to a settlement conference with Magistrate Judge Nathanael Cousins. ECF 27, 28.[2] The settlement conference with Judge Cousins occurred on May 5, 2017. ECF 30. Again, Nelson Chao attended but Ingrid Chao did not appear. ECF 35. The parties did not resolve the matter. *Id*.

After the settlement conference, Ridola moved to file a First Amended Complaint in order to allege accessibility barriers related to her disability that were identified by Ridola's expert during the parties' joint inspection of the Motel. *See* ECF 36. Ridola served Defendants with the motion by mail as well as with a courtesy email copy, but they did not file any opposition. ECF 37. On June 22, 2017, the Court granted Ridola's motion for leave to amend pursuant to Federal Rule of Civil Procedure 15. ECF 39. The FAC was filed in the record on June 23, 2017, and Defendants were served with the FAC by mail. *See* FAC; ECF 41 (Certificate of Service). The FAC seeks an award of injunctive relief, statutory damages, attorneys' fees, and costs. *See* FAC.

Defendants did not respond to the FAC within the applicable time. On July 11, 2017, counsel for Ridola wrote a letter to Defendants notifying them that any further delay will result in

---

[2] After the CMC, the parties also stipulated to a discovery schedule for this action. ECF 32.

a request that the Clerk enter a default against them. *See* Irakli Karbelashvili Decl. ¶ 6; Exh. A to Irakli Karbelashvili Decl., ECF 58-12. Defendants did not respond to the letter and did not file a responsive pleading to the FAC. Ridola then moved for entry of default against Defendants, which the Clerk ultimately entered on August 10, 2017. ECF 47.[3]

On August 18, 2017, counsel for Ridola mailed a letter to Defendants notifying them of the entry of default and suggesting that the parties could stipulate to set aside the default if Defendants agreed to defense this action, including filing a response to the FAC. *See* Exh. B to Irakli Karbelashvili Decl., ECF 58-13. In the letter, Ridola also notified Defendants of her intention to move for default judgment seeking injunctive relief and statutory damages as well as reasonable attorneys' fees and costs. *Id.* Defendants did not respond to the August 18, 2017 letter. *See* Irakli Karbelashvili Decl. ¶ 7.

On September 6, 2017, Defendants moved to set aside the Clerk's entry of default. ECF 48. Defendants represented that they did not know that they needed to do anything other than show up at the trial set for August 2019. *See* ECF 48. Defendants further represented in their motion that: "I understand now I have to respond to the first amended complaint and we will do so if given the chance." *Id.* at 2-3. In support of the motion, Nelson Chao and Ingrid Chao further testified in their declarations that they understood that they had to respond to the FAC. *See* ECF 49 ¶ 5; ECF 50 ¶ 6. Ridola did not oppose Defendants' motion to set aside the Clerk's entry of default. Irakli Karbelashvili Decl. ¶ 8; *see also* Statement of Non-Opposition, ECF 53. On September 11, 2017, the Court granted Defendants' motion to set aside the Clerk's entry of default and vacated the entry of default. ECF 54. Defendants were served with the Court's Order by mail but still did not respond to the FAC. *See* ECF 54-1, 54-2.

On October 25, 2017, counsel for Ridola again mailed a letter to Defendants notifying them that Ridola would move for entry of default if a response to the FAC was not filed by October 31, 2017. *See* Declaration of Irakli Karbelashvili ISO Pltfs' Third Request to Enter Default ¶ 9, ECF 55-1. Defendants did not respond to the letter or to the FAC, and Ridola filed

---

[3] Before entering default, the Clerk declined to enter default twice until Ridola filed a corrected proof of service. *See* ECF 43, 45.

her third request for the Clerk to enter default against Defendants. *See* ECF 55. The Clerk entered default against Defendants on November 20, 2017. ECF 56.

On December 8, 2017, Ridola filed the present motion for default judgment against Defendants, requesting that the Court award her $8,000.00 in statutory damages and $19,094.50 in attorneys' fees and costs. *See generally* Mem. Ridola also seeks an injunction requiring the removal of the architectural barriers to access identified in her FAC. *Id.* After being served with Ridola's moving papers, Defendants filed a request to file a motion to dismiss (ECF 61), and an opposition to the motion for default judgment (ECF 62). The Court issued an order striking without prejudice Defendants' request to file a motion to dismiss, explaining that Defendants must first seek to set aside the entry of default for good cause pursuant to Federal Rule of Civil Procedure 55(c) as they had previously done on September 6, 2017. *See* ECF 67. The Court advised Defendants to move to set aside the entry of default on or before February 3, 2018, otherwise the Court would review Ridola's motion for default judgment. *Id.*; *see also* Certificates of Service (ECF 67-1, 67-2).

Defendants did not move to set aside the Clerk's entry of default, and they did not appear at the hearing on Ridola's motion for default judgment held on May 10, 2018. *See* ECF 68. Given Defendants' previous participation in this case, the Court explained to Ridola that it would wait until the end of the day to provide Defendants with a final opportunity to appear and request to set aside the Clerk's November 20, 2017 entry of default. Defendants did not appear or move to set aside the entry of default. The Court now GRANTS Ridola's motion for default judgment for the reasons that follow.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 55(b), the Court may enter default judgment against a defendant who has failed to plead or otherwise defend an action. "The district court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F. 2d 1089, 1092 (9th Cir. 1980).

In exercising its discretion to enter default judgment, a district court considers seven factors set forth by the Ninth Circuit in *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986)

("*Eitel* factors"): (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of dispute concerning material facts; (6) whether default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. In considering these factors after a clerk's entry of default, the court takes all well-pleaded factual allegations in the complaint as true, except those with regard to damages. *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987). The Court may, in its discretion, consider competent evidence and other papers submitted with a motion for default judgment to determine damages. *Id.*

## III. DISCUSSION

Before the Court analyzes the *Eitel* factors, the Court notes that default judgment pursuant to Rule 55 is appropriate even though Defendants have appeared in this action.[4] The record makes clear that Defendants have become unresponsive and have failed to defend this action by filing a response to the FAC or moving to set aside the Clerk's entry of default despite expressly being given the opportunity to do so. *See* ECF 54, 67. Although Defendants filed an opposition to Ridola's motion for default judgment, that brief argues the merits of the action and accuses counsel for Ridola of violating their ethical obligations. ECF 63. The Court acknowledges that Defendants want to tell their side of the story, but the Court has given Defendants several opportunities to litigate this case since its inception over two years ago in April 2016. On default, the Court is now required to assume liability as pled. Had Defendants filed a response to the FAC at any point between June 23, 2017, and the date of this Order—as they represented in their previous motion that they would if given the chance to do so—the result of this case may have been different.

Defendants also had months to request that the Clerk's November 20, 2017 entry of default be set aside. The Court expressly extended such an opportunity on January 5, 2018, and again at

---

[4] As discussed at length above, although Defendant Ingrid Chao has filed various documents, she has never appeared in person at the joint site inspection, mediation, CMC, or settlement conference. The Court further advised Defendant Nelson Chao at the CMC that he is not an attorney and therefore he cannot represent his co-defendant in this action.

the hearing on Ridola's motion for default judgment held on May 10, 2018—at which Defendants did not appear. Based on the foregoing, and as discussed further below, Defendants have failed to respond to the FAC and "otherwise defend" the action in accordance with Rule 55(a). The Court now turns to the procedural requirements for a default judgment, followed by an analysis of the *Eitel* factors and Ridola's request for relief.

### A. Service of Process

When a plaintiff requests default judgment, the court must first assess whether the defendant was properly served with notice of the action. *See, e.g.*, *Solis v. Cardiografix*, No. 12–cv–01485, 2012 WL 3638548, at *2 (N.D. Cal. Aug. 22, 2012). Defendant Nelson Chao was personally served with the summons and complaint on May 1, 2016 by a registered process server. ECF 7. Defendant Ingrid Chao was also properly served via substitute service on May 1, 2016, when the process server left the documents with Nelson Chao at Ingrid's residence. *Id*. Under Federal Rule of Civil Procedure 4(e), service on an individual within a judicial district of the United States is adequate if made by "leaving a copy of [the summons and complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." Fed. R. Civ. P. 4(e)(2)(B).

Defendants then answered the original complaint, and all documents in this action have been served upon them by mail at their address of record. Importantly, Defendants were served with the operative FAC by mail on June 23, 2017. ECF 41. Defendants have filed documents in this case making clear that they are aware of the FAC and their obligation to respond to it. *See* ECF 48, 49, 50. Moreover, neither Defendant is a minor, an incompetent person, or a person whose waiver has been filed. *See* Fed. R. Civ. P. 4(e), 55(b)(2). The Court is satisfied that service of process was adequate.

### B. Jurisdiction

The Court next considers whether it has subject matter jurisdiction over the action, and personal jurisdiction over the parties. Both are satisfied here. The FAC seeks relief under federal law, including violations of Title III of the Americans with Disabilities Act, 42 U.S.C. §12181 *et seq.* (fourth cause of action). *See* FAC ¶¶ 40-43. Therefore, federal question jurisdiction exists

7

over the ADA claim pursuant to 28 U.S.C. § 1331, and the Court has supplemental jurisdiction over Ridola's state law claims pursuant to 28 U.S.C. § 1367.  The Court also has personal jurisdiction over Defendants, as the FAC alleges that at all relevant times, Defendants owned and operated the Motel and adjacent parking lot in Santa Clara County.  *See* FAC ¶¶ 1, 6, 12-13. Defendants also reside in California, and are therefore subject to general personal jurisdiction in this Court.

### C.  *Eitel* Factors

#### i.  Factor One: Possibility of Prejudice to the Plaintiff

The first *Eitel* factor considers whether the plaintiff would suffer prejudice if default judgment is not entered.  Without entry of default, Ridola would have no other means of recourse against Defendants for the damages caused by their conduct.  Mem. at 14.  Accordingly, the first factor favors entry of default judgment.  *See, e.g.*, *Wilamette Green Innovation Ctr., LLC v. Quartis Capital Partners*, No. 14-cv-00848, 2014 WL 5281039, at *6 (N.D. Cal. Jan. 21, 2014) (citations omitted) ("Denying a plaintiff a means of recourse is by itself sufficient to meet the burden posed by this factor.").

#### ii.  Factors Two and Three: Merits of the Plaintiff's Substantive Claims and the Sufficiency of the FAC

The Court considers the second and third *Eitel* factors—concerning the merits of Ridola's substantive claims and the sufficiency of her FAC—together because of the relatedness of the inquiries.  In analyzing these factors, the Court accepts as true all well-pleaded allegations regarding liability.  *See, e.g.*, *HICA Educ. Loan Corp. v. Warne*, No. 11-cv-04287, 2012 WL 1156402, at *2 (N.D. Cal. Apr. 6, 2012).  However, Defendants are "not held to admit facts that are not well-pleaded or to admit conclusions of law." *DIRECTV, Inc. v Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007).  "[N]ecessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of No. America*, 980 F.2d 1261, 1267 (9th Cir. 1992).

The Court first addresses Ridola's federal claim for violations of Title III of the ADA, which prohibits discrimination by public accommodations.  The statute provides that "[n]o

individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  To prevail on a Title III discrimination claim, Ridola must show that (1) she is disabled within the meaning of the ADA; (2) Defendants own, lease, or operate a place of public accommodation; and (3) she was denied public accommodations by Defendants because of her disability.  *See Molski v. M.J. Cable, Inc.,* 481 F.3d 724, 730 (9th Cir. 2007).

In this case, Ridola's claim for discrimination under Title III includes "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable."  42 U.S.C. § 12182(b)(2)(A)(iv).  The term "readily achievable" means "easily accomplishable and able to be carried out without much difficulty or expense."  *Id.* § 12181(9).  Accordingly, "[t]o succeed on an ADA claim of discrimination on account of one's disability due to an architectural barrier, Ridola must also prove that: (1) the existing facility presents an architectural barrier prohibited under the ADA; and (2) the removal of the barrier is readily achievable.  *See Parr v. L & L Drive–Inn Restaurant,* 96 F.Supp.2d 1065, 1085 (D. Haw. 2000); *see also Johnson v. Beahm,* No. 2:11–cv–0294 MCE JFM, 2011 WL 5508893, *2 (E.D. Cal. Nov. 8, 2011).

For the reasons that follow, the Court determines that Ridola has stated a claim against Defendants under Title III of the ADA.

### 1.    ADA Standing

The Court must first determine whether Ridola has Article III standing to bring a claim under the ADA.  To establish Article III standing, a plaintiff must demonstrate that he or she has suffered an injury in fact, that the injury is traceable to the defendant's challenged conduct, and that the injury can be redressed by a favorable decision.  *Hubbard v. Rite Aid Corp.,* 433 F.Supp.2d 1150, 1162 (S.D. Cal. 2006).  Ridola has Article III standing because she alleges in her FAC that she is disabled within the meaning of the ADA and she was denied access to the goods and services offered by the Motel to its non-disabled guests, which has deterred disabled persons from patronizing the Motel in the future.  FAC ¶¶ 2, 5.  Specifically, Ridola alleges that she

personally encountered barriers to her full and equal access at the Motel and parking lot, including that she twice requested an accessible room but her request was denied each time. FAC ¶ 14. She also had issues in the parking lot area because the ramp adjacent to the access aisle encroached into the access aisle, making it difficult to stabilize her wheelchair prior to getting out of her car. *Id*. Ridola also could not eat breakfast in the breakfast area with ease because Defendants did not provide ADA seating. *Id.* ¶ 15. Ridola has also alleged that these encountered architectural barriers were the cause of the denial of access and that Defendants knew these areas of the Motel were inaccessible. *See, e.g.*, FAC ¶ 19. Finally, an award of statutory damages and injunctive relief would redress Ridola's alleged injuries. *Id.* at 14. In light of Defendants' default in this case, the Court accepts Ridola's allegations as true and finds that she has standing to bring an ADA claim against Defendants.

The Ninth Circuit has made clear that "an ADA plaintiff who establishes standing as to encountered barriers may also sue for injunctive relief as to unencountered barriers related to [her] disability." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011); *see also Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1047 (9th Cir. 2008) ("We hold that Doran has standing to sue for injunctive relief for all barriers in the North Harbor 7–Eleven store related to his specific disability, including those identified in his expert's site inspections.") Accordingly, because Ridola has Article III standing with respect to the barriers she encountered, she also has standing to pursue injunctive relief with respect to unencountered barriers identified in the FAC that were discovered at the joint site inspection. *See* FAC ¶ 17.

Finally, where a plaintiff seeks injunctive relief, he or she must also demonstrate a significant possibility of future harm. *See San Diego County Gun Rights Comm. v. Reno,* 98 F.3d 1121, 1126 (9th Cir. 1996). "In the ADA context, in determining the likelihood that a plaintiff will return to defendant's facility, courts have examined such factors as (1) the proximity of the place of public accommodation to plaintiff's residence, (2) plaintiff's past patronage of defendant's business, (3) the definitiveness of plaintiff's plans to return, and (4) the plaintiff's frequency of travel near defendant." *See Hubbard v. Rite Aid Corp.*, 433 F. Supp. 2d 1150, 1163

1  (S.D. Cal. 2006) (citing *Pickern v. Holiday Quality Foods, Inc.,* 293 F.3d 1133, 1137 (9th

2  Cir.2002)).

3        A disabled individual suffers a cognizable injury if she is deterred from visiting a

4  noncompliant public accommodation because she has encountered barriers related to her disability

5  there. *See Vogel v. Rite Aid Corp.*, 992 F. Supp. 2d 998, 1008 (C.D. Cal. 2014) (citing *Chapman,*

6  631 F.3d at 949); *see also Doran,* 524 F.3d at 1042 n. 5 ("Once a disabled individual has

7  encountered or become aware of alleged ADA violations that deter his patronage of or otherwise

8  interfere with his access to a place of public accommodation, he has already suffered an injury in

9  fact traceable to the defendant's conduct and capable of being redressed by the courts, and so he

10  possesses standing under Article III"); *Pickern,* 293 F.3d at 1138 ("We hold that a disabled

11  individual who is currently deterred from patronizing a public accommodation due to a

12  defendant's failure to comply with the ADA has suffered 'actual injury'"). Ridola alleges that

13  Defendants' failure to make the Motel and its parking lot accessible to all customers regardless of

14  disability has deterred her from patronizing the Motel. FAC ¶ 2; Ridola Decl. ¶ 3. Specifically,

15  Ridola states that due to her housing situation, she would choose to stay at the Motel again due to

16  their reasonable rates. *See* Ridola Decl. ¶ 3. However, she fears that her rights and those of

17  disabled persons will continue to be ignored by Defendants. *Id.* Accordingly, Ridola has satisfied

18  the requirements for Article III standing and can seek injunctive relief for both encountered and

19  unencountered barriers under the ADA.

20        **2.**      **Elements of ADA Claim**

21        Accepting Ridola's allegations as true, Ridola has shown that (1) she is disabled within the

22  meaning of the ADA; (2) Defendants own, lease, or operate a place of public accommodation; and

23  (3) Ridola was denied public accommodations by Defendants because of her disability. *See*

24  *Molski*, 481 F.3d at 730. First, Ridola alleges that she is disabled within the meaning of the ADA.

25  FAC ¶ 5; Ridola Decl. ¶ 1. Under the ADA, an individual who requires the use of a wheelchair is

26  considered disabled. *See* 42 U.S.C. § 12102(1)(A) (defining a physical impairment substantially

27  affecting a major life activity as qualifying as a disability); § 12102(2)(A) (stating that "major life

28  activities include…walking"). Second, Ridola alleges that Defendants are the tenants and/or

owners of the Motel and adjacent parking lot, which she alleges are places of public accommodation under the ADA. FAC ¶¶ 1, 6, 41; *see* 42 U.S.C. § 12181(7). Defendants are therefore liable for violating the ADA if Ridola shows that she suffered discrimination at the Motel due to her disability. *See, e.g.*, *Vogel*, 992 F. Supp. 2d at 1007.

Third, as alleged in the FAC, Ridola's ADA claim requires her to show that the alleged architectural barriers at the Motel and adjacent parking lot denied her public accommodations due to her disability. The Court finds that Ridola has adequately alleged that the subject property has architectural barriers that render the premises inaccessible to and unusable by wheelchair users. *See* FAC ¶¶ 14-18; *see also* 42 U.S.C. § 12182(b)(2)(A)(iv). Ridola states that she visited the Motel on four separate occassions and that she encountered numerous barriers at check-in, in the parking lot, and in the breakfast area. FAC ¶¶ 14-15; Ridola Decl. ¶¶ 4-7. The FAC also alleges a host of additional barriers related to Ridola's disability that were discovered at the August 5, 2016 joint site inspection. FAC ¶ 17. Ridola contends that all of these barriers violate the Americans with Disabilities Act Accessibility Guidelines, found in the ADA's implementing regulations at 28 C.F.R. Part 36 ("ADAAG"). *See* Mem. at 6-7.

The Ninth Circuit has held that the ADAAG provide "objective contours of the standard that architectural features must not impede disabled individuals' full and equal enjoyment of accommodations." *Chapman*, 631 F.3d at 945. Accordingly, a violation of the ADAAG constitutes a barrier under the ADA. "The ADAAG's requirements are as precise as they are thorough, and the difference between compliance and noncompliance with the standard is often a matter of inches." *Chapman*, 631 F.3d at 945–946. Violations of Title III of the ADA entitle a plaintiff to injunctive relief in the form of an "order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12188(a)(2).

On March 15, 2012, new federal accessibility standards for alterations and new construction went into effect, known as the 2010 ADA Standards for Accessible Design ("2010 Standards"). 28 C.F.R. § 35.151. *See* Mem. at 7. Alterations to facilities undertaken after March 15, 2012 must comply with the 2010 Standards. 28 C.F.R. § 35.151(c)(5)(i); *Fortyune v. City of Lomita*, 766 F.3d 1098, 1103 (9th Cir. 2014). Ridola contends that the Motel was constructed

prior to March 2012 and no construction or alteration has been made to the Motel since March 15, 2012. *See* Declaration of Irene Karbelashvili ("Irene Karbelashvili Decl.") ¶ 5, ECF 58-8. Therefore, the Court agrees with Ridola that for purposes of determining whether a barrier existed at the time of Ridola's visits to the Motel, the 1991 ADAAG applies ("1991 Standards"). However, the 2010 Standards govern any injunction that the Court issues, as all remedial work will be undertaken after March 15, 2012.

Based on the 1991 Standards applicable to construction completed prior to March 15, 2012, the Court finds that the alleged barriers at the Motel and its parking lot violate the ADAAG. Ridola alleges that no accessible rooms were ever provided despite her request each time she stayed at the Motel. FAC, ¶ 14; Ridola Decl. ¶ 5. At the joint inspection, Defendant Nelson Chao admitted that the Motel had a total of 31 rooms and that only one was reserved for disabled guests (Room 104). Declaration of Bassam Altwal ("Altwal Decl.") ¶ 7, ECF 58-5. Ridola was unable to inspect Room 104 because it was being permanently occupied. *Id*. Accordingly, there were effectively no accessible rooms at the Motel available to disabled guests. *Id*. Pursuant to the 1991 Standards, § 9.1.4 a place of lodging that has between 26 and 50 sleeping rooms must provide at least two (2) accessible rooms and such rooms must be dispersed among the various classes of sleeping accommodations to provide a range of options applicable to room size, costs, amenities, and number of beds. Accordingly, Defendants have failed to provide a sufficient amount of accessible rooms.

Next, Ridola alleges that she had difficulty stabilizing her wheelchair prior to disembarking from her car because the ramp adjacent to the access aisle encroaches into the access aisle. FAC ¶ 14. This is in violation of the 1991 Standards, § 4.7.8 ("Curb ramps shall be located or protected to prevent their obstruction by parked vehicles."). As for the complete lack of accessible seating in the Motel's breakfast area (FAC ¶ 15), the 1991 Standards require at least 5%, but no less than one, accessible seating in areas where food is consumed. *See* 1991 Standards, § 5.1. For the foregoing reasons, Ridola has alleged that the encountered barriers violated the law.

Ridola has also alleged that several unencountered barriers that are related to her disability which were discovered at the joint site inspection also violate the law and must be remediated.

13

- *Exterior Accessible Route – from Street-side Sidewalk*: There is not an exterior accessible route (48 in. wide with no vertical changes greater than ¼ in.) from the public right-of-way to an accessible entry and other accessible site elements (FAC ¶ 17).  This violates the 1991 Standards, §§ 4.6.3 and 4.3.  *See* Mem. at 10.

- *Exterior Accessible Route—Parking*: There is no phone number or address posted that indicates where the towed vehicles can be claimed in violation of the California Building Code ("CBC") 1129B.4;[5] (2) The cross slope of the accessible route is greater than 1:50 or 2% in violation of 1991 Standards, § 4.3.7; and (3) the accessible route has abrupt vertical changes in level greater than ¼ in. in violation of 1991 Standards, § 4.5.2.  *See* FAC ¶ 17; Mem. at 10.

- *Exterior Accessible Route—Walkway by Rooms 99 & 104*: The cross slope of the accessible route is greater than 1:50 or 2% in violation of 1991 Standards, § 4.3.7.  *See* FAC ¶ 17; Mem. at 10.

- *Exterior Accessible Route—Drop-off Zone*: There is not an exterior accessible route (48 in. wide with no vertical changes greater than ¼ in.) from the public right-of-way to an accessible entry and other accessible site elements in violation of 1991 Standards, § 4.6.3. FAC ¶ 17; Mem. at 10.

- *Parking–General*: Parking spaces are not located such that parked vehicles do not encroach on the clear width of an accessible route in violation of 1991 Standards, § 4.6.3. FAC ¶ 17; Mem. at 10.

- *Parking – ADA Stalls*: (1) There is not an accessible route of travel from the accessible parking space access aisle to the customer entry/exit door in violation of 1991 Standards, § 4.6.3; (2) The accessible parking space is not 18 ft. minimum in length in violation of 1991 Standards, § 4.6.3; (3) The accessible parking space does not have an 8 ft. wide access aisle for a van (5 ft. wide for single) in violation of 1991 Standards, § 4.6.3; (4) The accessible parking spaces surface slopes exceed 1:50 or 2% in all directions in violation of 1991 Standards, § 4.6.3; (5) The "NO PARKING" letters are not a minimum of 12 in. high and located so they are visible to traffic enforcement officials in violation of CBC 1129B.4; and (6) The access aisle does not connect directly to an accessible route in violation of 1991 Standards, § 4.6.3. FAC ¶ 17; Mem. at 10.

---

[5] As the federal government does with the ADA, California mandates specific requirements for building accessibility by statute.  *See* Cal. Gov't Code § 4450; Cal. Health & Safety Code § 19956, 19959.  To seek an injunction under the Unruh Act and the Health and Safety Code, a disabled plaintiff need not necessarily show a violation of the ADA, but can instead demonstrate that the Motel in question does not comply with applicable California Code of Regulations, Title 24, Part 2, commonly referred to as the California Building Code ("CBC"), which sets forth accessibility requirements for public accommodations.  Below, the Court addresses the barriers alleged to be violations of the Unruh Act, rather than the ADA, but lists them here for completeness.

- *Drop-off Zone—Driveway:* There is no 20 ft. minimum of vehicle pull-up space in passenger drop-off zone, violating 1991 Standards, § 4.6.6. FAC ¶ 17; Mem. at 10.

- *Drop-off Zone—Night Window:* The top of the counter is not 28 in. to 34 in. above the finished floor in violation of 1991 Standards, § 4.23.3. FAC ¶ 17; Mem. at 10.

- *Drop-off Zone—Night Bell:* Reach ranges for mounted objects are note: • 48 in. high • 46 in. high over an obstruction 20–25 in. deep side reach (max obstruction is 34" high) • 44 in. high over an obstruction 20–25 in. deep front reach • 15 in. low in violation of CBC 1118B.4. FAC ¶ 17; Mem. at 11.

- *Main Customer Entry/Exit Doors—Front Door:* (1) Interior and exterior doors need more than 5 lbs of maximum pressure to operate and panic hardware requires more than 15 lbs to release in violation of 1991 Standards, § 4.13.11(2); and (2) the bottom 10 in. of door does not have a smooth uninterrupted surface in violation of CBC 1133B.2.6. FAC ¶ 17; Mem. at 11.

- *Main Customer Entry/Exit Doors –Access Door to Restroom*: (1) The clear floor area on the pull side of the door beyond the strike jamb is not at least 24 in. wide x 5 ft. (60 inches) deep in violation of 1991 Standards, § 4.13.6; and (2) the door handle/lock is not easy to operate with a closed fist in violation of 1991 Standards, § 4.13.9. FAC ¶ 17; Mem. at 11.

- *Main Customer Entry/Exit Doors—Business Center*: (1) The door handle/lock is not easy to operate with a closed fist in violation of 1991 Standards, § 4.13.9; (2) the bottom 10 in. of door does not have a smooth uninterrupted surface in violation of CBC 1133B.2.6. FAC ¶ 17; Mem. at 11.

- *Interior Cashier Counter—Front Desk:* The top of the counter is not 28 in. to 34 in. above the finished floor in violation of 1991 Standards, § 4.23.3; and (2) the lowered writing surface is not at least 36 in. wide in violation of 1991 Standards, §§ 7.2(2), 5.2 & CBC 1122B.5. FAC ¶ 17; Mem. at 11.

- *Table Seating Areas—Dining Room (also referred to as "breakfast area"):* (1) There is no knee space 27 in. high, 30 in. wide, and 19 in. deep. in violation of 1991 Standards, § 4.32.4; and (2) there is no accessible route from the service counter to the seating area and to related toilet facilities in violation of CBC 1104B.3.2. FAC ¶ 17; Mem. at 11.

- *Vending Machines*: The highest operable control (typically the coin slot) is not at or below a height of 48 in. (54" older codes) in violation of 1991 Standards, § 4.2.5. FAC ¶ 17; Mem. at 11.

- *ATMs—Lobby*: There is not a 48 in. wide x 48 in. deep clear floor area in front of the ATM that has no slope over 2% in violation of 1991 Standards, § 4.34.2. FAC ¶ 17; Mem. at 11.

- *Customer Restrooms—Office:* (1) There is no ADA customer restroom on the site in violation of 1991 Standards, § 4.1.6(e); (2) there is no sign directing users to an accessible customer restroom in violation of CBC 1117B.5.1; (3) the sign does not have the symbol of accessibility in violation of 1991 Standards, § 4.1.6(e)(iii); (4) there is no accessible route to the restroom door in violation of 1991 Standards, § 4.1.3(2); (5) the narrowest clear width of the doorway opening is not at least 32 in. when a single leaf of the door is open to a 90 degree position in violation of 1991 Standards, § 4.13.5; (6) door height clearance is not a minimum of 80 in. in violation of 1991 Standards, § 4.13.5; and (7) the clear floor area on the pull side of the door beyond the strike jamb is not at least 18 in. wide x 5 ft. (60") deep by the clear width of the door in violation of 1991 Standards, § 4.13.6. FAC ¶ 17; Mem. at 12.

- *Business Center –Work Desk:* There is no knee space 27 in. high, 30 in. wide, and 19 in. deep in violation of 1991 Standards, § 4.32.4. FAC ¶ 17; Mem. at 12.

- *Guest Suites:* "Accessible room" is not on an accessible route of travel in violation of 1991 Standards, § 4.1.3(1). FAC ¶ 17; Mem. at 12.

- *Pool and Spa Area—Gate:* (1) It does not take at least 5 seconds for the door to close (from an open position of 90 degrees to 3 in. from the closed position) in violation of 1991 Standards, § 4.13.10; and (2) interior and exterior doors need more than 5 lbs of maximum pressure to operate in violation of 1991 Standards, § 4.13.11(2). FAC ¶ 17; Mem. at 12.

- *Pool and Spa Area—General:*(1) The swimming pool is not accessible because there is no mechanism to assist a person with disabilities into and out of the pool in violation of CBC 1104.4.3; (2) the bottom 10 in. of the gate does not have a smooth uninterrupted surface in violation of CBC 1133B.2.6; (3) there is not an accessible table provided at the pool in violation of 1991 Standards, § 4.32.4; and (4) there is no knee space 27 in. high, 30 in. wide, and 19 in. deep in violation of 1991 Standards, § 4.32.4. FAC ¶ 17; Mem. at 12.

Accepting Ridola's allegations as true, the Court finds that she has satisfied the ADA's requirement for a plaintiff to show that the alleged barriers are prohibited by the ADA (or as discussed below, the Unruh Act) and that the architectural barriers denied her full and equal access to the Motel and parking lot because of her disability.

Finally, in an existing building, removal of the barriers must be readily achievable, which means that the barrier removal can be accomplished with little difficulty or expense. 42 U.S.C. § 12181(9); 28 C.F.R. § 36.104. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007). Pursuant to the ADA, determining whether an action is readily achievable involves consideration of four factors: "(A) the nature and cost of the action needed; (B) the overall financial resources of

the facility or facilities involved in the action; the number of persons employed at such facility; the

effect on expenses and resources, or the impact otherwise of such action upon the operation of the

facility; (C) the overall financial resources of the covered entity; the overall size of the business of

a covered entity with respect to the number of its employees; the number, type, and location of its

facilities; and (D) the type of operation or operations of the covered entity, including the

composition, structure, and functions of the workforce of such entity; the geographic separateness,

administrative or fiscal relationship of the facility or facilities in question to the covered

entity." 42 U.S.C. § 12181(9).

Ridola argues that the Ninth Circuit has explicitly held that whether removal of barriers is

"readily achievable" is an affirmative defense that must be pled by the answering party. *See* Mem.

at 4 (citing *Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004)).

The Court is not persuaded by Ridola's reading of *Lentini*, which instead held that "[w]hether an

accommodation *fundamentally alters* a service or facility is an affirmative defense," which is a

different issue. *Id.* (emphasis added). However, the Court does find that various district courts in

the Ninth Circuit have applied the Tenth Circuit's burden-shifting framework articulated in

*Colorado Cross Disability v. Hermanson Family, Ltd.,* 264 F.3d 999 (10th Cir. 2001). *See, e.g.*,

*Vogel*, 992 F. Supp. 2d at 1010–11; *see also Sceper v. Trucks Plus,* No. Civ S–09–0801 GEB

EFB, 2009 WL 3763823, *3 (E.D. Cal. Nov. 3, 2009) (agreeing with the District of Arizona that

until the Ninth Circuit provides additional and specific instruction to lower courts, it will follow

the overwhelming majority of federal courts that apply the burden-shifting framework, especially

in the context of a default judgment where defendants have not appeared).

Accordingly, although Ridola has not identified a case where the Ninth Circuit explicitly

decided who has the burden of proving that removal of an architectural barrier is readily

achievable, the Court follows the district courts applying the *Colorado Cross* framework.[6] Under

that framework, the "[p]laintiff bears the initial burden of production to present evidence that a

---

[6] In fact, when the Ninth Circuit did address *Colorado Cross* directly for the first time in the context of barrier removal from within historic buildings, the Ninth Circuit actually placed the entire burden squarely on the defendant. *See Molski v. Foley Estates Vineyard and Winery, LLC,* 531 F.3d 1043, 1048 (9th Cir. 2008).

suggested method of barrier removal is readily achievable." 264 F.3d at 1006. If the plaintiff makes this showing, the burden shifts to the defendant, who "bears the ultimate burden of persuasion regarding [his] affirmative defense that a suggested method of barrier removal is not readily achievable." *Id.*

Ridola has alleged that Defendants knew of the architectural barriers at the Motel and in the parking lot, and that they have the financial resources to remove these barriers from the Motel without much difficulty or expense to make the Motel accessible to disabled guests. FAC ¶ 19. Moreover, many of the barriers alleged by Ridola are presumed to be readily achievable under 28 C.F.R. § 36.304(b) (providing that examples of readily achievable steps to remove barriers include installing ramps, rearranging tables, chairs, vending machines, display racks, and other furniture, widening doors, installing accessible door hardware, and creating designated accessible parking spaces).

The Court finds that on default, Ridola's allegations satisfy her burden of production as to whether removal of the barriers is readily achievable. *Vogel*, 992 F.Supp.2d at 1011; *Johnson v. Hall,* 2012 WL 1604715, *3 (E.D. Cal. May 7, 2012) (holding that plaintiff's allegation that architectural barriers "are readily removable" and that he sought injunctive relief to remove all readily achievable barriers" satisfied his burden); *Johnson v. Beahm*, No. 2:11-CV-0294-MCE-JFM, 2011 WL 5508893, at *2 (E.D. Cal. Nov. 8, 2011) (holding that the plaintiff's allegations that architectural barriers were readily removable was sufficient because the allegations are taken as true on default). Because Defendants have defaulted and chosen not to defend this action, they have failed to meet their burden to show that removal of the identified barriers is not readily achievable. The Court also notes that although Defendants filed answers to the original complaint before they defaulted, they did not raise a "readily achievable" affirmative defense. ECF 9, 11.

For the foregoing reasons, the Court concludes that Ridola has established all elements of her claim for a violation of Title III of the ADA against Defendants. As the above confirms, Ridola has shown that (1) she is disabled within the meaning of the ADA; (2) Defendants own, lease, and/or operate a place of public accommodation; and (3) she was denied public accommodations by the Defendants because of her disability. *Chapman*, 631 F.3d at 945; *Molski*

*v. M.J. Cable, Inc.*, 481 F.3d at 730; *see* FAC ¶¶ 40-43.  Finally, Ridola has satisfied her burden to show that the barriers are easily removed by Defendants without much difficulty or expense.  FAC ¶ 19.

Ridola has therefore satisfied the second and third *Eitel* factors with respect to the merits of her substantive ADA claim and the sufficiency of the FAC with respect to the ADA claim.  The Court next considers the merits and sufficiency of Ridola's state law claims.

### 3. California State Law Claims

Because a violation of the ADA constitutes a *per se* violation of the Unruh Act, the Court also concludes that Ridola has adequately stated a claim under the Unruh Civil Rights Act.  *See* Cal. Civ. Code § 51(f); *Lentini*, 370 F.3d at 847 ("[A] violation of the ADA is, per se, a violation of the Unruh Act."); *see* FAC ¶¶ 27-32.

The Court also finds that Ridola has stated a claim under the California Health and Safety Code.  *See* FAC ¶¶ 21-26; 44-48.  Pursuant to California Health & Safety Code § 19955, all public accommodations constructed in California must comply with the requirements of Cal. Gov't Code § 4450.  Pursuant to Government Code § 4450, "all buildings, structures, sidewalks, curbs, and related facilities, constructed in this state by the use of state, county, or municipal funds, or the funds of any political subdivision of the state shall be accessible to and usable by persons with disabilities."  All buildings constructed or altered after July 1, 1970, must comply with standards governing the physical accessibility of public accommodations.  Cal. Gov't Code § 4450(a); Cal. Health & Safety Code § 19955; *D'Lil v. Stardust Vacation Club*, No. CIV-S-00-149 6DFL PAN, 2001 WL 1825832, at *7 (E.D. Cal. Dec. 21, 2001).  Since December 31, 1981, those standards governing accessibility of public accommodations in California have been set forth in Title 24 of the California Regulatory Code.  *See Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 607 (N.D. Cal. 2004), *amended in part,* No. C 02-5849 PJH, 2012 WL 3070863 (N.D. Cal. July 26, 2012).

Aside from ADA violations, state law claims may be premised on violations of the California Building Code ("CBC"), also known as Title 24.  *See* Cal. Civ. Code § 54; Cal. Health & Safety Code § 19955; Cal. Code Regs Title 24 § 1134B.1, 2.  The CBC does not require facilities that pre-date its enactment to comply with its regulations unless and until the facility is

19

altered.  However, Ridola alleges that the Motel is a public accommodation and that it has

undergone construction and/or alterations after January 1982, and as such, is subject to access

requirements under Title 24/the CBC. FAC ¶ 25.  Even though certain barriers listed above do not

amount to ADA violations, Ridola has demonstrated that the Motel does not comply with the

applicable regulations set forth in Title 24/the CBC—the accessibility requirements for public

accommodations in California.  *See Pickern v. Best W. Timber Cove Lodge Marina Resort*, No.

CIV.S-00-1637 WBS/DA, 2002 WL 202442, at *7 (E.D. Cal. Jan. 18, 2002), *superseded in

part*, 194 F. Supp. 2d 1128 (E.D. Cal. 2002) ("Under the state statutes, a plaintiff can show either

that the ADA was violated, or that the facility in question does not comply with the California

Building Code requirements for disabled access, which are commonly referred to as Title 24.")

Because the Motel and parking lot are not accessible to individuals with disabilities in

violation of the CBC, Ridola has shown that Defendants have violated California Health and

Safety Code § 19953 *et seq.* FAC ¶ 25.

Ridola also seeks relief under California Business & Professions Code § 17200 & § 17500.

Section 17200 prohibits a business from "unfair competition [which] shall mean and include any

unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading

advertising."  Because Ridola alleges that Defendants have violated California law described

above, she has likewise stated a claim for relief against Defendants under the "unlawful" prong of

section 17200.  *See* FAC ¶ 47.

Section 17500, also known as California's False Advertising Practices Act, prohibits

"…any person, firm, corporation or association...to make or disseminate…any statement… which

is untrue."  Ridola alleges that Defendants have violated section 17500 because they "have

represented that their services are available to all members of the general public, when, in fact,

said Defendants deny full and equal access to such services to disabled individuals who use

wheelchairs by reason of Defendants' failure to comply with their legal obligations under the

Unruh Act." FAC ¶ 52.  Accordingly, Ridola has stated a claim for relief under § 17500.

Finally, although Ridola brought a claim under the Disabled Persons Act as her third cause

of action in the FAC, she seeks damages on default judgment on her Unruh Act claim and does not

move for default judgment on the Disabled Persons Act claim. *See* Mem. at 14 n.2.

For the foregoing reasons, Ridola has stated claims for relief under California law in addition to the ADA, satisfying the second and third *Eitel* factors, and making her entitled to injunctive relief under both federal and state law.

### iii. Factor Four: The Sum of Money at Stake in the Action

Under the fourth *Eitel* factor, the Court considers the amount of money at stake in the litigation. *BMW of North Am., LLC v. Zahra*, Case No. 15-cv-2924, 2016 WL 215983, at *4 (N.D. Cal. Jan. 19, 2016). When the amount is substantial or unreasonable, default judgment is discouraged. *Id.* Here, Ridola seeks a judgment in the amount of $8,000 in statutory damages for two visits to the Motel on April 28 and 29, 2014 under the Unruh Act and $19,094.50 in attorneys' fees and costs for a total monetary award of $27,094.50. *See* Mem. at 15; Altwal Decl. ¶ 9; Irene Karbelashvili Decl. ¶ 6; Irakli Karbelashvili Decl. ¶ 15. These amounts are far less than the amount sought in *Eitel*—$2.9 million—and serves to sway this factor in favor of granting Ridola's motion for default judgment. *Eitel*, 782 F.2d at 1472.

### iv. Factors Five and Six: The Possibility of a Factual Dispute or Excusable Neglect

Under the fifth and sixth *Eitel* factors, the Court considers where there is the possibility of a factual dispute over any material fact and whether Defendants failure to respond may have resulted from excusable neglect. *BMW*, 2016 WL 215983, at *4. The record makes clear that Defendants knew how to move to set aside a default entered against them, but chose not to with respect to the most recent entry of default, despite being given the opportunity to do so. ECF 48, 67. There is no dispute of material fact because Defendants have not responded to the FAC, and upon an entry of default by the Clerk, the factual allegations of the FAC related to liability are taken as true. There is also nothing to suggest that there was been a technical error or excusable neglect on Defendants' behalf. *See Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1005 (N.D. Cal. 2001) (finding that the "default of defendant…cannot be attributed to excusable neglect…[when they were] properly served with the Complaint, the notice of entry of default, as well as the papers in support of the instant motion.").

On September 6, 2017, Defendants stated in their declarations and motion to set aside the previous default that they would respond to the FAC "if given the chance." ECF 48, 49, 50. When given the chance, and repeatedly reminded by counsel for Ridola to respond to the FAC, Defendants did not respond. Defendants also did not appear at the hearing on Ridola's motion for default judgment. Thus, both factors five and six weigh in favor of granting default judgment.

### v. Factor Seven: Policy Favoring Decision on the Merits

Although federal policy favors decisions on the merits, Rule 55(b)(2) permits entry of default judgment in situations, such as this, where a defendant refuses to litigate. *J & J Sports Prods., Inc. v. Deleon*, No. 5:13-CV-02030, 2014 WL 121711, at *2 (N.D. Cal. Jan. 13, 2014). Therefore, this general policy is outweighed by the more specific considerations in this case outlined above, and the seventh *Eitel* factor weighs in favor of default.

### vi. Summary

After considering all seven *Eitel* factors and the circumstances of this case, the Court finds that default judgment is warranted and GRANTS Ridola's motion for default judgment against Defendants on all of the claims for which she moves for default judgment.[7]

### D. Relief Sought

The Court next considers Ridola's request for injunctive relief, statutory damages, attorneys' fees, and costs. *See generally* Mem. Federal Rule of Civil Procedure 54(c) allows only the amount prayed for in the complaint to be awarded to a plaintiff on default judgment. *See* Fed. R. Civ. Proc. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings"); *Philip Morris USA Inc. v. Banh,* No. CV 03–4043 GAF (PJWx), 2005 WL 5758392, at *6 (C.D. Cal. Jan. 14, 2005). Under Rule 8(a)(3), a plaintiff's demand for relief must be specific, and he or she "must 'prove up' the amount of damages." *Philip Morris USA Inc.*, 2005 WL 5758392, at *6. Unlike liability, defaulting defendants are not deemed to have admitted facts concerning damages alleged in the complaint. *See TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987).

---

[7] The Court does not grant default judgment with respect to Ridola's Disabled Persons Act claim, which she no longer pursues. Mem. at 14 n.2.

### i. Injunctive Relief

The ADA permits private individuals to seek injunctive relief. *Molski*, 481 F.3d at 730. When the Court has determined that defendant violated the ADA, "injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities." 42 U.S.C.A. § 12188. The Court may also grant injunctive relief for violations of the Unruh Act under § 52.1(h).

Under the ADA, injunctive relief is proper when architectural barriers at the defendant's establishment violate the ADA and the removal of the barriers is readily achievable. *See, e.g., Moreno v. La Curacao,* 463 Fed.Appx. 669, 670 (9th Cir. 2011). As discussed at length above under the second and third *Eitel* factors, Ridola has demonstrated that each alleged barrier at the Motel and parking lot violated either the 1991 Standards or the CBC. Accordingly, Ridola has satisfied the requirements for injunctive relief compelling Defendants to remove barriers at the Motel so that the public accommodation is readily accessible to and usable by individuals with disabilities.

Ridola seeks an injunction that would require Defendants to make the following modifications on or before December 31, 2018:

Rooms: (1) Provide requisite number of accessible rooms; (2) Provide accessible route of travel to the accessible rooms.

Exterior Accessible Routes: (1) *From Street-side Sidewalk*: Provide an exterior accessible route (48 in. wide with no vertical changes greater than ¼ in.) from the public right-of-way to an accessible entry and other accessible site elements; (2) *Parking*: Provide phone number or address that indicates where the towed vehicles can be claimed; modify the cross slope of the accessible route so it is no greater than 1:50 or 2%; and modify abrupt vertical changes in accessible route so that they are not greater than ¼ in.; (3) *Walkway by Rooms 99 & 104:* Modify cross slope of the accessible route so that it is no greater than 1:50 or 2%; *Drop-off Zone:* Provide an exterior accessible route (48 in. wide with no vertical changes greater than ¼ in.) from the public right-of-way to an accessible entry and other accessible site elements.

Parking: (1) *General*: Modify parking spaces so they are not located such that parked

23

vehicles encroach on the clear width of an accessible route. (2) *ADA Stalls*: (i) Provide an accessible route of travel from the accessible parking space access aisle to the customer entry/exit door; (ii) provide parking space that is 18 ft. minimum in length; (iii) provide accessible parking so that it has an 8 ft. wide access aisle for a van (5 ft. wide for single); (iv) reduce accessible parking spaces surface slope so that it does not exceed 1:50 or 2% in either direction; (v) provide "NO PARKING" letters at a minimum of 12 in. in high and located so they are visible to traffic enforcement officials; (vi) Connect the access aisle directly to an accessible route.

Drop-off Zone: (1) *Driveway*: Provide a 20 ft. minimum of vehicle pull-up space in the passenger drop-off zone in; (2) *Night Window*: Remediate the counter so that the top of the counter is between 28 in. to 34 in. above the finished floor; (3) *Night Bell*: Provide reach ranges for mounted objects so that they are:· 48 in. high · 46 in. high over an obstruction 20–25 in. deep side reach (max obstruction is 34" high) · 44 in. high over an obstruction 20–25 in. deep front reach · 15 in. low so they comply with CBC 1118B.4.

Main Customer Entry/Exit Doors: (1) *Front Door:* (i) Adjust door pressure on interior and exterior doors so no more than 5 lbs of maximum pressure is needed to operate and so that panic hardware does not requires more than 15 lbs to release; and (ii) remediate the bottom 10 in. of door so it has a smooth uninterrupted surface; (2) *Access Door to Restroom*: (i) Provide a clear floor area on the pull side of the door so that it is at least 24 in. wide x 5 ft. (60 inches) deep; and (ii) modify the door handle/lock is not so that it is easy to operate with a closed fist; (3) *Business Center*: (i) Modify the door handle/lock so that it is easy to operate with a closed fist; (ii) remediate the bottom 10 in. of door so it has a smooth uninterrupted surface.

Interior Cashier Counters: (1) *Front Desk:* (i) Modify the top of the counter so that it is between 28 in. to 34 in. above the finished floor; and (ii) modify the lowered writing surface so that it is at least 36 in. wide.

Table Seating Areas: (1) *Dining Room* (also referred to as "breakfast area"): (i) Provide knee space clearance 27 in. high, 30 in. wide, and 19 in. deep; and (ii) provide an accessible route from the service counter to the seating area and to related toilet facilities; (iii) provide sufficient amount of accessible seating (5% but no less than 1).

Vending Machines: Modify highest operable control so that it is below a height of 48 in.

ATMs – Lobby: Provide 48 in. wide x 48 in. deep clear floor area in front of the ATM that has slope not more than 2%.

Customer Restrooms: (1) *Office*: (i) Provide ADA customer restroom on the site; (ii) provide sign directing users to an accessible customer restroom with a symbol of accessibility; (iii) provide accessible route to the restroom door; (iv) provide clear width of the doorway so that it opens at least 32 in. when a single leaf of the door is open to a 90 degree position; (v) provide door height clearance a minimum of 80 in.; and (vi) provide clear floor area on the pull side of the door beyond the strike jamb that is at least 18 in. wide x 5 ft. (60") deep by the clear width of the door.

Business Center: *Work Desk:* Provide knee space 27 in. high, 30 in. wide, and 19 in. deep.

Pool and Spa Area: (1) *Gate*: (i) Adjust gate so that it takes at least 5 seconds for the door to close (from an open position of 90 degrees to 3 in. from the closed position) and (ii) adjust door pressure of the interior and exterior doors so they need more than 5 lbs of maximum pressure to operate; (2) *General*: (i): Provide access to the swimming pool via mechanism to assist a person with disabilities into and out of the pool in violation; (ii) modify the gate so the bottom 10 in. of the gate has a smooth uninterrupted (iii) provide an accessible table at the pool; and (iv) provide knee space 27 in. high, 30 in. wide, and 19 in. deep.

*See* Proposed Judgment, ECF 58-16.

Based on the sufficiency of Ridola's allegations and the entry of default against Defendants, the Court finds that Ridola is entitled to such an injunction under the ADA and the California Unruh Act ordering the removal of each of the alleged barriers at the Motel related to her disability. *See* 42 U.S.C. § 12188(a)(2); Cal. Civ. Code § 52(c)(3); *see Chapman*, 631 F.3d at 944 (holding that "an ADA plaintiff who establishes standing as to encountered barriers may also sue for injunctive relief as to unencountered barriers related to [her] disability.") However, in light of the large number of barriers that Defendants are required to address, the Court finds that one year is a more reasonable amount of time for Defendants to accomplish the modifications.

Accordingly, Defendants are hereby ORDERED to modify the Motel and parking lot to be

in compliance with the ADA 2010 Standards and Title 24 of the California Code of Regulations, with all work to be completed **on or before May 18, 2019.**

### ii. Statutory Damages

Because the Unruh Act provides for a minimum statutory damages award of $4,000.00 for each occasion an individual is denied equal access to an establishment covered by the Unruh Act, the Court finds that Ridola is entitled to a total of $8,000.00 in statutory damages for her documented visits to the Motel on April 28, 2014 and April 29, 2014. *See* Cal. Civ. Code § 52(a); *see* FAC ¶ 14; Declaration of Fernando Cervantes ("Cervantes Decl.") ¶ 3, ECF 58-3.

### iii. Attorneys' Fees and Costs

Ridola seeks to recover $19,094.5 in attorneys' fees and litigation costs. Mem. at 19. A court may, in its discretion, award attorneys' fees and litigation expenses, including expert witness fees, to the prevailing party in a discrimination action. 42 U.S.C. § 12205; Cal. Civ. Code § 52(a). For the reasons that follow, the Court finds that counsel for Ridola have presented sufficient evidence to conclude that the fees and costs requested are reasonable and justified.

In calculating awards for attorneys' fees, courts use "the 'lodestar' method, and the amount of that fee must be determined on the facts of each case." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008) (quoting *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 n.4 (9th Cir. 2001) (internal quotation marks and citations omitted); *see also Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996) *opinion amended on denial of reh'g*, 108 F.3d 981 (9th Cir. 1997). The moving party bears the burden of providing relevant documentation demonstrating the reasonableness of the hours spent on the litigation. *Hensley*, 461 U.S. at 433. In the absence of adequate documentation supporting the number of hours expended on the lawsuit, "the district court may reduce the award accordingly." *Id.* "The district court also should exclude from this initial [lodestar] calculation hours that were not 'reasonably expended.'" *Id.* at 434 (quoting S. Rep. No. 94-1011, p. 6 (1976)). When determining the reasonable hourly rate, the court must weigh the "experience, skill, and reputation of the attorney requesting fees," and

1  compare the requested rates to prevailing market rates.  *Chalmers v. City of Los Angeles,* 796 F.2d

2  1205, 1210 (9th Cir. 1986) *opinion amended on denial of reh'g*, 808 F.2d 1373 (9th Cir. 1987);

3  *see also Blum v. Stenson*, 465 U.S. 886, 886 (1984).  Once calculated, the lodestar amount, which

4  is presumptively reasonable, may be further adjusted based on other factors not already subsumed

5  in the initial lodestar calculation.  *Morales*, 96 F.3d at 363–64, 363 nn.3–4 (identifying factors)

6  (citing *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).

7  Ridola's counsel Irene Karbelashvili declares that she incurred $5,850 in attorneys' fees

8  for a total of 18 hours worked at an adjusted hourly rate of $325 per hour.  *See* Irene Karbelashvili

9  Decl. ¶ 7.  Irakli Karbelashvili declares that he incurred $ 4,522.50 in attorneys' fees for a total of

10  20.10 hours worked at an hourly rate of $225 per hour.  *See* Irakli Karbelashvili Decl. ¶¶ 14-15.

11  Under the lodestar analysis, the Court must first determine whether counsels' rates are reasonable,

12  as determined by "the prevailing market rates in the relevant community."  *Blum*, 465 U.S. at 886.

13  The market rates used in this comparison should pertain to attorneys with similar "skill,

14  experience, and reputation" to the moving attorneys.  *Chalmers*, 796 F.2d at 1211(citing *Blum*,

15  465 U.S. at 895 n.11).  Second, the Court must examine whether the hours expended on this

16  litigation are reasonable.

17  The Court finds that counsels' rates of $325 and $225 per hour, respectively, are

18  reasonable rates in light of the attorneys' skill and experience handling disability access cases.[8]  *In*

19  *re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 591–92 (N.D. Cal. 2015) ("In the Bay Area,

20  'reasonable hourly rates for partners range from $560 to $800, for associates from $285 to $510,

21  and for paralegals and litigation support staff from $150 to $240.'").  The Court also finds the

22  number of hours expended reasonable in light of the work performed by each attorney, and the

23  lengthy procedural history of this case including a joint site inspection, motion practice,

24  mediation, a case management conference, and a settlement conference.  *See* Irakli Karbelashvili

25  Decl. ¶¶ 6-12.  Both attorneys have provided a thorough description of their qualifications and

26  support for the reasonableness of their rates and litigation costs related to this matter.  They have

27

28  [8] The Court also notes that counsel Irene Karbelashvili's rates are normally higher but for the purposes of Ridola's motion she seeks only $325 per hour. *See* Mem. at 17.

also submitted itemizations of how attorney time was spent on this case. *See* ECF 58-9; 58-15.

Ridola's expert, Bassam Altwal, also spent 31.75 hours on this matter at a rate of $240 per hour for a total of $7,620.00. *See* Altwal Decl. ¶¶ 3, 9-10; *see also* ECF 58-7. The Court finds this rate and amount of hours reasonable and justified. *Accord Rodgers v. Fitzgerald*, No. 14- CV-00985-DMR, 2016 WL 4658974, at *6–7 (N.D. Cal. Sept. 7, 2016) (finding Altwal's hourly rate of $240 reasonable); *see also Heifetz v. West San Carlos Court Apartments, LLC et al*, No. 5:17-cv-01451-NC (N.D. Cal. Nov. 13, 2017), *report and recommendation adopted*, No. 5:17-cv-01451-EJD (N.D. Cal. Nov. 29, 2017).

As Ridola's request for attorneys' fees and expert fees is reasonable and adequately justified, the Court GRANTS her request for fees. Ridola also seeks to recover $1,102.00 in filing fees and service costs. *See* Irene Karbelashvili Decl. ¶ 11. The costs are reasonable and the Court will award them.

In sum, the Court GRANTS Ridola's request for attorneys' fees, costs, and litigation expenses as the prevailing party in this case under both federal and state law. The Court awards fees and costs as follows:

| Name | Hours | Hourly Rate | Total |
|---|---|---|---|
| Irene Karbelashvili | 18.00 | $325 | $5,850.00 |
| Irakli Karbelashvili | 20.10 | $225 | $4,522.50 |
| Bassam Altwal | 31.75 | $240 | $7,620.00 |
| Costs | N/A | N/A | $1,102.00 |
| | | **TOTAL:** | $19,094.50 |

## IV. ORDER

For the foregoing reasons, it is HEREBY ORDERED THAT:

1. Ridola's motion for default judgment against Defendants Nelson Chao and Ingrid Chao is GRANTED.

2. The Court GRANTS a permanent injunction. Defendants are liable jointly and severally for bringing the Motel's premises into compliance with the ADA and California state law as follows by **May 18, 2019**:

- Rooms: (1) Provide requisite number of accessible rooms; (2) Provide accessible route of travel to the accessible rooms.

- Exterior Accessible Routes: (1) *From Street-side Sidewalk*: Provide an exterior accessible route (48 in. wide with no vertical changes greater than ¼ in.) from the public right-of-way to an accessible entry and other accessible site elements; (2) *Parking*: Provide phone number or address that indicates where the towed vehicles can be claimed; modify the cross slope of the accessible route so it is no greater than 1:50 or 2%; and modify abrupt vertical changes in accessible route so that they are not greater than ¼ in.; (3) *Walkway by Rooms 99 & 104:* Modify cross slope of the accessible route so that it is no greater than 1:50 or 2%; *Drop-off Zone:* Provide an exterior accessible route (48 in. wide with no vertical changes greater than ¼ in.) from the public right-of-way to an accessible entry and other accessible site elements.

- Parking: (1) *General*: Modify parking spaces so they are not located such that parked vehicles encroach on the clear width of an accessible route. (2) *ADA Stalls*: (i) Provide an accessible route of travel from the accessible parking space access aisle to the customer entry/exit door; (ii) provide parking space that is 18 ft. minimum in length; (iii) provide accessible parking so that it has an 8 ft. wide access aisle for a van (5 ft. wide for single); (iv) reduce accessible parking spaces surface slope so that it does not exceed 1:50 or 2% in either direction; (v) provide "NO PARKING" letters at a minimum of 12 in. in high and located so they are visible to traffic enforcement officials; (vi) Connect the access aisle directly to an accessible route.

- Drop-off Zone: (1) *Driveway*: Provide a 20 ft. minimum of vehicle pull-up space in the passenger drop-off zone in; (2) *Night Window*: Remediate the counter so that the top of the counter is between 28 in. to 34 in. above the

finished floor; (3) *Night Bell*: Provide reach ranges for mounted objects so that they are:· 48 in. high · 46 in. high over an obstruction 20–25 in. deep side reach (max obstruction is 34" high) · 44 in. high over an obstruction 20–25 in. deep front reach · 15 in. low so they comply with CBC 1118B.4.

- Main Customer Entry/Exit Doors: (1) *Front Door:* (i) Adjust door pressure on interior and exterior doors so no more than 5 lbs of maximum pressure is needed to operate and so that panic hardware does not requires more than 15 lbs to release; and (ii) remediate the bottom 10 in. of door so it has a smooth uninterrupted surface; (2) *Access Door to Restroom*: (i) Provide a clear floor area on the pull side of the door so that it is at least 24 in. wide x 5 ft. (60 inches) deep; and (ii) modify the door handle/lock is not so that it is easy to operate with a closed fist; (3) *Business Center*: (i) Modify the door handle/lock so that it is easy to operate with a closed fist; (ii) remediate the bottom 10 in. of door so it has a smooth uninterrupted surface.

- Interior Cashier Counters: (1) *Front Desk:* (i) Modify the top of the counter so that it is between 28 in. to 34 in. above the finished floor; and (ii) modify the lowered writing surface so that it is at least 36 in. wide.

- Table Seating Areas: (1) *Dining Room* (also referred to as "breakfast area"): (i) Provide knee space clearance 27 in. high, 30 in. wide, and 19 in. deep; and (ii) provide an accessible route from the service counter to the seating area and to related toilet facilities; (iii) provide sufficient amount of accessible seating (5% but no less than 1).

- Vending Machines: Modify highest operable control so that it is below a height of 48 in.

- ATMs – Lobby: Provide 48 in. wide x 48 in. deep clear floor area in front of the ATM that has slope not more than 2%.

- Customer Restrooms: (1) *Office*: (i) Provide ADA customer restroom on the site; (ii) provide sign directing users to an accessible customer restroom

with a symbol of accessibility; (iii) provide accessible route to the restroom door; (iv) provide clear width of the doorway so that it opens at least 32 in. when a single leaf of the door is open to a 90 degree position; (v) provide door height clearance a minimum of 80 in.; and (vi) provide clear floor area on the pull side of the door beyond the strike jamb that is at least 18 in. wide x 5 ft. (60") deep by the clear width of the door.

- Business Center: *Work Desk:* Provide knee space 27 in. high, 30 in. wide, and 19 in. deep.

- Pool and Spa Area: (1) *Gate*: (i) Adjust gate so that it takes at least 5 seconds for the door to close (from an open position of 90 degrees to 3 in. from the closed position) and (ii) adjust door pressure of the interior and exterior doors so they need more than 5 lbs of maximum pressure to operate; (2) *General*: (i): Provide access to the swimming pool via mechanism to assist a person with disabilities into and out of the pool in violation; (ii) modify the gate so the bottom 10 in. of the gate has a smooth uninterrupted (iii) provide an accessible table at the pool; and (iv) provide knee space 27 in. high, 30 in. wide, and 19 in. deep.

3. Defendants are liable jointly and severally for $8,000 in statutory damages and $19,094.50 in attorney fees, costs, and litigation expenses, for a total monetary award of $27,094.50. It is HEREBY ORDERED that Ridola shall recover this total amount from Defendants.

4. The Clerk shall enter judgment in favor of Ridola and against Defendants Nelson Chao and Ingrid Chao, vacate all pretrial and trial dates, and close the file.

Dated: May 18, 2018

BETH LABSON FREEMAN
United States District Judge

31